John L. CROWELL, Individually and
on Behalf of All Others Similarly
Situated, Plaintiffs,

v.

IONICS, INC., Arthur L. Goldstein, and
Daniel M. Kuzmak Defendants.

No. CIV.A.03–10393–WGY.

United States District Court,
D. Massachusetts.

Nov. 3, 2004.

Jason D. Frank, Kimberly C. Nuzum, Testa, Brian E. Pastuszenski, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Christopher F. Robertson, Seyfarth Shaw, LLP, Boston, MA, for Ionics, Inc., Arthur L. Goldstein, Daniel M. Kuzmak, Defendants.

Samuel H. Rudman, Cauley, Geller, Bowman, Coates & Rudman, LLP, Melville, NY, for John L Crowell, Plaintiff.

Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, for Jerome Deckler, John L Crowell, Plaintiffs.

## MEMORANDUM

YOUNG, Chief Judge.

This case involves a federal securities law class action on behalf of all individuals who purchased or acquired the common stock of Ionics, Inc. ("Ionics") between October 25, 2001, and March 14, 2003 (inclusively, the "Class Period"), and were damaged by allegedly materially false or misleading statements that Ionics made regarding its financial situation and operations. Am. Compl. ¶ 9 [Doc. No. 12]. The lead plaintiff, John L. Crowell[1] ("Crowell"), seeks certification of the class and, ultimately, damages. Ionics, along with the defendants Arthur L. Goldstein ("Goldstein") and Daniel M. Kuzmak ("Kuzmak") (collectively, "Ionics Defendants"), move to dismiss under Federal Rule of Civil Procedure 12(b)(6), partly on standing grounds, but primarily attacking the legal sufficiency of Crowell's complaint, particularly in light of the heightened pleading requirements under the federal securities laws and under Federal Rule of Civil Procedure 9(b). After a hearing on February 24, 2004, the Court denied the Ionics Defendants' Motion To

---

1. On June 9, 2003, this Court allowed Mr. Crowell's motion to be appointed lead plaintiff, thereby replacing Jerome Deckler as the named plaintiff in this matter.

Dismiss from the bench. This memorandum explains the reasons behind the Court's decision.

## I. INTRODUCTION

### A. Facts

The Court takes the facts alleged in Crowell's Complaint as true in considering the Ionics Defendants' Motion to Dismiss. Crowell has attributed the facts alleged to witness or document sources, as this Court has required. Given the heightened pleading requirements in securities fraud cases, the facts must be described in some detail.

### 1. The Parties

Crowell allegedly purchased Ionics common stock during the Class Period at artificially inflated prices, and was damaged thereby. Am. Compl. ¶ 6. Ionics is a Massachusetts corporation with its principal place of business in Watertown, Massachusetts. *Id.* ¶ 7. Goldstein was at all relevant times Ionics' Chairman and Chief Executive Officer. *Id.* ¶ 8(a). Kuzmak was at all relevant times Ionics' Chief Financial Officer and Vice President. *Id.* ¶ 8(b). Crowell has adequately alleged facts suggesting that the class action is an appropriate form for this litigation.

### 2. Ionics and its Operations

Ionics develops and manufactures systems and provides related services for water treatment, and also produces desalination, water, and wastewater treatment systems and instruments. *Id.* ¶ 7. Most of its revenues come from long-term sales and construction-type contracts. *Id.* ¶ 15. According to Crowell, "[t]hese transactions are highly complex and require a highly effective system of internal controls

and procedures, among other things, in order to properly recognize contract revenues and costs in the Company's financial statements." *Id.*

Ionics manages its operations through four business group segments: the equipment business group ("EBG"), the ultrapure water group ("UWG"), the consumer water group ("CWG"), and the instrument business group ("IBG"). *Id.* ¶ 16. Within these business segments, Ionics has identified certain core product and market sectors, including water desalination/purification equipment and facilities serving general industries and municipalities, and ultrapure water processing systems servicing primarily the microelectronics and power industries. *Id.*

In 2001, the EBG and the UWG accounted for roughly 67 percent of Ionics' revenues, and that percentage grew to approximately 80 percent near the beginning of the Class Period, due to the December 2001 sale of the company's Aqua Cool Pure Bottled Water Operations in the United States, the United Kingdom, and France ("Aqua Cool"). *Id.* ¶ 17.[2] In other words, the Aqua Cool assets accounted for over 16 percent of the company's 2001 revenues, and comprised the major portion of Ionics' consumer segment revenues and assets both in the United States and abroad. *Id.* ¶ 18. "At all relevant times, therefore, the [Ionics] defendants were highly motivated to make it appear that EWG and UWG segments were operating profitably." *Id.*

In recent years, Ionics has increasingly implemented a "build, own, and operate" ("build-own-operate") strategy whereby the company constructs, owns, operates, and maintains water desalination and purification facilities, among other activities.

---

**2.** After selling Aqua Cool, Ionics retained certain Aqua Cool operations in the Middle East and the Carribean. *Id.* ¶ 18.

*Id.* ¶ 19. During the Class Period, Ionics maintained or initiated investments in at least seven foreign "affiliated" companies under the build-own-operate strategy, including Grupo Empresarial de Mejoramiento Ambiental, S. de R.L. de C.V.—Mexico (the "EDF project") and Desalination Company of Trinidad and Tobago, Ltd. ("Desalcott" or the "Trinidad project"). *Id.* Ionics has a minority interest in each of the seven known foreign affiliates (50 percent or less), and so does not include affiliate financial statements in its consolidated financial statements. *Id.*

Ionics conducts a substantial amount of its EBG business through sales of equipment and construction services to companies outside the United States. *Id.* ¶ 20. In 2001, revenues of over $20 million resulted from such sales, but that number declined to $12 million in 2002.[3] *Id.* Ionics primarily attributed the decline to the completion of the Desalcott construction project in Trinidad. *Id.* Purportedly, where Ionics has a 20 percent to 50 percent ownership interest in an affiliate, it uses equity basis accounting and makes certain profit eliminations or deferrals on its sales to those affiliates. *Id.*

### 3. Ionics Reports Allegedly Artificially Inflated Financial Results by Failing to Record Losses on Long–Term Contracts in the Period During Which They Were Incurred

On November 5, 2002, Ionics issued a press release announcing that it was restating its financial results for the first two quarters of fiscal year 2002. *Id.* ¶ 21. The announcement "stunned" the market. *Id.* Ionics reduced previously reported income by roughly $1,300,000, or over 31 percent, for the six months ending June 30, 2002. *Id.* The company attributed the restatement to "intercompany transactions between the Company and its French subsidiary that were erroneously recorded at the subsidiary level." *Id.* (quoting Ionics' press release).

The "intercompany transactions" were in fact unrecorded "project cost overruns," among other things, that Ionics incurred on the EDF project (in Mexico) prior to and during the first two quarters of 2002, but failed to report in its consolidated operating results. *Id.* ¶ 22. At least $600,000 of the restated costs and expenses related to the EDF project. *Id.* ¶ 23. Former employees of Ionics France, a French subsidiary that was losing money at the time, state that when Ionics was closing the books for the first quarter of 2002, during April 2002, a dispute arose between Ionics' corporate controller, Anthony DiPaola, and certain officers of Ionics France over the recording of $2,000,000 in EDF cost overruns, which Ionics (through Goldstein and others) directed Ionics France to record. *Id.* ¶ 23–24. These and other losses (probably from Kuwait) that Ionics sought to shift onto its European subsidiaries totaled an estimated $5,000,000 to $6,000,000. *Id.* ¶ 26. The Ionics France employees refused to place the costs on Ionics France's books, because the costs related to Ionics' losses from its business segments in Mexico and the United States; in other words those losses were not attributable to Ionics France. *Id.* ¶ 23. Ionics France's Vice President was fired in April 2002 for refusing to follow Goldstein's orders, and the decision was allegedly made by Goldstein and Ed Cichon ("Cichon"), Ionics' Vice President and head of the BEG. *Id.* ¶ 25.

---

**3.** In 2002, without explanation, Ionics restated its 2001 "Revenue—unaffiliated customers," reducing it by $21 million from $466 million to $445 million. Am. Compl. ¶ 20 n. 1.

Essentially, Ionics was seeking to shift losses from its own books to those of a subsidiary. A former Ionics France employee has stated that the motive for this was to reduce Ionics' tax liabilities arising from a $19,000,000 gain related to the December 2001 sale of Aqua Cool's France operations. *Id.* ¶ 26. Another former Ionics France employee stated that during the second quarter of 2002, Ionics attempted to falsify tax documents prepared in connection with the Aqua Cool sale, stating the proceeds as a long-term profit rather than a short-term profit after three years. *Id.*

Thus, as of at least April 2002, the Ionics Defendants knew that Ionics France did not record the costs and expenses associated with the EDF project cost overruns, among others, which the Ionics Defendants had ordered the French subsidiary's controller to record during 2002's first two quarters. *Id.* ¶ 27. According to Crowell, "Ionics has now restated its financial statements for the first and second quarter of 2002, thereby admitting that those financial statements were materially false and misleading when issued." *Id.* ¶ 28.[4]

### 4. Ionics Allegedly Improperly Accounts for Long–Term Contract Revenues, Thereby Overstating its Financial Results

The aforementioned accounting improprieties were not the only ones in which Ionics is alleged to have engaged. Crowell alleges that during the Class Period, Ionics overstated revenues and profits by millions of dollars by improperly accounting for costs and expenses associated with its long-term equipment and construction contracts. *Id.* ¶ 29. Ionics shifted "cost overruns" on certain long-term equipment sales contracts and construction projects from unprofitable projects where they were actually incurred to other unrelated projects that could absorb the costs and mask the losses. *Id.* ¶ 30. This action allowed Ionics to continue to accrue contract revenues under the percentage of completion accounting method using falsified cost estimates (i.e. the estimates excluded the cost overruns). *Id.*

Under the "percentage of completion accounting method," Ionics recognizes revenues on its equipment sales contracts using periodic estimates of the ratio of costs incurred to date and the total estimated costs to complete the contract. *Id.* ¶ 31. Former Ionics employees state that the Ionics Defendants routinely approved falsification of cost estimates. *Id.* ¶ 32. All of Crowell's examples, however, come from before the Class Period began.

For example, Kuzmak and other Ionics executives ordered contract cost estimates falsified at Ionics' Bridgeville, Pennsylvania manufacturing facility, which allowed Ionics to accrue sales revenues and profits on certain commercial and United States Navy nuclear programs that were actually unprofitable. *Id.* ¶ 32. At a January 2001 meeting to discuss "some accounting principles" at Ionics' Pittsburgh division (which

---

4. It is unclear from the parties' filings to what extent the foreign affiliates' results were reported in Ionics' consolidated financial statements, the way subsidiaries' results were reported. Answers to questions at oral argument provided little illumination on the subject. Thus, it is unclear whether the Court is confronting a situation where a company violates Generally Accepted Accounting Principles ("GAAP") by failing to consolidate re-sults from an entity over which the company exercises sufficient control to require such consolidation. It may be that EDF costs would ordinarily be reported on Ionics' consolidated financial statement. The Ionics Defendants seem implicitly to assume in their arguments that whether the EDF losses were recorded at Ionics France or at their true source, they would appear on the consolidated balance sheet all the same.

owned the Bridgeville facility), Kuzmak stated "I want to go on the record stating it's not proper accounting—but it's nice to make money." *Id.* ¶ 33.

Similar practices occurred at Desalcott, which was building a water treatment facility. *See id.* ¶ 34. A former employee of Ionics' European operations stated that in the third quarter of 2001, Ionics recognized revenues prematurely to "compensate" Ionics for losses it was incurring during the construction phase of the Trinidad project. *Id.* Accounting rules only permitted Ionics to record future revenues for cubic meters of water that had been sold, but revenues were recorded before construction of the water treatment plant was even completed. *Id.*

Ionics lacked the internal controls necessary properly to utilize percentage of completion accounting, and had no dedicated internal audit function. *Id.* ¶ 35. Rather, divisional controllers performed "desk audits" to review cost estimates and other information developed by operations personnel, and then sent results to the corporate office. *Id.* Price Waterhouse Coopers, Ionics' independent auditor, relied on these reports when it conducted its periodic examination. *Id.*

Operational personnel had incentive to recognize revenue improperly, as their performance ratings were based on the unit's financial results. *Id.* A former controller in Ionics' Asian division, employed by Ionics between February 2001 and March 2003, stated that whereas other companies he had worked for closely examined estimates used to recognize revenue every quarter, most of the time at Ionics the operations personnel's numbers were not examined at all. *Id.* ¶ 35(a). A former controller of Ionics' Pittsburgh division stated that he knew that Ionics overstated equipment contract revenues by $2,200,000 in 1999, and that he told Di

Paola and Bob Halliday, Ionics' vice president of finance, about it, but that neither executive ever corrected the misstatement. *Id.* ¶ 35(b).

### 5. Ionics Allegedly Misstates the 2001 Operating Results of its Bottled Water Operations

On December 3, 2001, the second month of the Class Period, Ionics announced that it had entered into an agreement to sell Aqua Cool to Perrier–Vittel, S.A., a subsidiary of Nestle, S.A. (collectively "Nestle"). *Id.* ¶ 36. The agreement included the sale of operations in the United States, the United Kingdom, and France to Aqua Cool for $220,000,000, subject to certain price adjustments. *Id.* The price of Ionics common stock appreciated over 12 percent after the announcement, closing at $30.99 on December 7, 2001, after several days of heavy trading. *Id.* ¶ 37.

Ionics allegedly had schemed to inflate Aqua Cool's product sales and customer base artificially in the period immediately preceding the Nestle acquisition in order to facilitate the sale and to meet or exceed certain financial performance criteria set out in the sales agreement with Nestle. *Id.* ¶ 38. In particular, the Ionics Defendants ordered Aqua Cool's sales force to deliver hundreds of thousands of unordered and unwanted bottled water products to Aqua Cool's retail customers, one extra bottle per customer. *Id.* ¶ 39. If the customer complained, they were told the extra bottle was free; otherwise, the customer was charged the ordinary price. *Id.* ¶ 39(b). Drivers were paid $1 per extra bottle delivered, as drivers ordinarily would not deliver merchandise not listed on the invoice. *Id.* Revenues were inflated by millions of dollars, and the number of "active" Aqua Cool customers was significantly overstated. *Id.* ¶ 40.

In December 2001, Ionics reported "a $112,000,000 gain from the Aqua Cool sale, ... less certain reserves for possible price adjustments as per the sales agreement with Nestle." *Id.* In the fourth quarter of 2002, Ionics announced a settlement of the price adjustments with Nestle that reduced the Aqua Cool sale price to $207,000,000, $13,000,000 less than the initially reported price. *Id.* The artificial inflation of revenues and sales probably explains most of the discrepancy. *See id.* ¶ 41.

### 6. Ionics Allegedly Fails to Disclose Deficiencies in its System of Internal Controls

Throughout the Class Period, Ionics represented that its "critical accounting policies" were being administered through a functioning system of internal controls. *Id.* ¶ 42. In its 2001 10–K form, filed with the SEC, Ionics stated:

The Company closely monitors compliance and consistency of application of its critical accounting policies related to contract accounting. In addition, reviews of the status of contracts are performed through periodic contract status and performance reviews. In all cases, changes to total estimated costs and anticipated losses, if any, are recognized in the period in which determined.

*Id.* Ionics' internal controls were in fact materially deficient. *Id.* ¶ 43. In a press release issued on March 14, 2003, and shortly thereafter in a 10–K Form released on March 31, 2003, the Ionics Defendants admitted that in connection with the audit of its 2002 financial statements, Ionics' independent auditor informed the Company "that certain of its internal controls had deficiencies and material weaknesses." *Id.* (quoting Ionics' 2002 10–K Form).[5] The release and the 10–K Form also revealed that Ionics had been taking numerous steps to correct known weaknesses in the accounting system throughout 2002. *See id.* ¶ 44 (providing an extensive quotation from Ionics' 2002 10–K Form).

### 7. Ionics' Allegedly False and Misleading Statements Issued During the Class Period

In general, Crowell describes period press releases and public filings (particularly 10–K and 10–Q Forms) that he alleges make materially false and misleading statements. Each of the 10–Q forms contains representations that "[i]n the opinion of the management of the Company, all adjustments have been made that are necessary for a fair statement of the consolidated financial position of the Company, the consolidated results of its operations and the consolidated cash flows for each period presented." *See, e.g., id.* ¶ 56.

On October 25, 2001, the beginning of the Class Period, Ionics announced its financial results for the third quarter and nine months ended September 30, 2001. *Id.* ¶ 45. In its press release, Ionics reported revenues of $118,300,000, net income of $4,200,000, and earnings per share of $0.24, as compared to $124,900,000, $2,900,000 and $0.18, respectively, from the third quarter in 2000. *Id.* For the first nine months of 2001, revenues were stated as $354,900,000, net income as $11,400,000, and earnings per share as $0.66, whereas the figures for the first nine months of 2000 were $330,500,000, $10,700,000, and $0.65, respectively. *Id.* In the press release, Goldstein stated that "our water supply and service businesses have continued to remain stable and predictable and provided a substantial portion of the prof-

---

5. Although this is not clear from the Complaint, the parties agreed at oral argument that the pertinent information in the 10–K Form was also in the press release.

its generated by the Company in the third quarter." *Id.*

On November 13, 2001, Ionics filed its quarterly report on Form 10–Q for the third quarter and nine months ended September 30, 2001, signed by Goldstein and Kuzmak. *Id.* ¶ 46. The 10–Q incorporated Ionics' previously issued financial results, and stated that the substantial revenue growth since the previous year was attributable "to continued growth in both the bottled water business, primarily in the United Kingdom, and home water business." *Id.* (quoting Ionics' November 13, 2001 10–Q Form).

In the December 3, 2001 press release regarding the sale of Aqua Cool to Nestle, Goldstein stated that Aqua Cool was "currently generating revenues of over $70 million per year." *Id.* ¶ 47 (quoting the press release). Heavy trading in Ionics common stock followed, leading to a 12 percent appreciation by December 7, 2001, and closing at $30.99 on that day. *Id.* ¶ 48.

On January 15, 2002, Ionics filed with the SEC on Form 8–K the "Master Agreement" governing the sale of Aqua Cool to Nestle. *Id.* ¶ 49. Under the agreement, the sales price of the Aqua Cool operations was subject to adjustment based on, *inter alia,* the number of active customer accounts at the date of transfer. *Id.* Within 180 days after closing, Nestle and Ionics would each make an independent determination as to which equipment customers qualified as "active customers," and Ionics would then have 90 days to accept Nestle's determination or to describe in detail any disagreement that might justify an adjustment of Nestle's estimate. *See id.* (providing an extensive quotation from the Master Agreement). Any unresolvable disputes would be submitted to an international accounting firm for resolution. *Id.*

In a March 7, 2002 press release, Ionics announced financial results for the fourth quarter and fiscal year ending December 31, 2001. *Id.* ¶ 50. Ionics reported $111,800,000 in revenues, $33,300,000 in net income, and $1.90 in earnings per share for the fourth quarter, as compared to $144,100,000, negative $12,600,000, and negative $0.77 per share, respectively, in the previous year's fourth quarter. *Id.* It also reported results for the year: revenues of $466,700,000 (including Aqua Cool revenues of roughly $76,200,000), net income of $44,700,000, and $2.59 in earnings per share, as compared to negative $1,900,000, and negative $0.12, respectively, for the previous year. *Id.* The release stated that "[n]et income for the fourth quarter includes a one-time, non-operating gain of $3.57 per share on the [Aqua Cool sale], as well as one-time and unusual costs which reduced operating income by $1.68 per share." *Id.* (quoting the release). Further, the "one-time and unusual costs" included "losses in the Consumer Water Group which occurred primarily in conjunction with the Aqua Cool business being readied for sale." *Id.* (quoting the release).

Goldstein stated in the release that "corporate bookings were at a near record level in the fourth quarter and that backlog reached $258.9 million, an increase of $38.9 million during the quarter." *Id.* (quoting the release). He further stated that Ionics' portion of a facility to be built in Kuwait in conjunction with the award of a large water reuse concession contract was not yet included in bookings of the year-end backlog. *Id.*

On March 29, 2002, Ionics filed its Annual Report on Form 10–K for the fiscal year ended December 31, 2001, signed by Goldstein and Kuzmak, which confirmed the announcements in the March 7, 2002 press release. *Id.* ¶ 51. It related that Ionics

had sold Aqua Cool for $220,000,000, of which $10,000,000 was being held in escrow pursuant to the terms of the divestiture agreement, and that Aqua Cool had had sales of $76,200,000 in 2001. *Id.*

According to Crowell, each of the statements described above was materially false and misleading, because each misrepresented or failed to disclose the following facts: (1) that Aqua Cool's reported $76,200,000 in sales was overstated by tens of millions of dollars as a result of Ionics' improper sales practices; (2) that Ionics' revenues accrued under the "percentage of completion accounting method" were materially overstated because of the falsification of contract cost estimates; (3) that this in turn rendered Ionics' reported financial results materially overstated; (4) that Ionics' financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and were therefore materially false and misleading; and (5) that Ionics' system of internal controls was materially deficient, resulting in an inability of Ionics to ascertain its true operating results and financial condition. *Id.* ¶ 52.

On May 6, 2002, Ionics issued a press release announcing financial results for the first quarter of 2002, which ended March 31, 2002. *Id.* ¶ 53. Revenues were stated as $80,300,000, net income as $1,900,000, and earnings per share as $0.11, as compared to $123,000,000, $3,000,000, and $0.18 per share, respectively, in the previous year's first quarter. *Id.* Goldstein stated that the results reflected continuing costs from Ionics' Malaysian business, the planned divestiture of which was supposed to take place during the second quarter, and from certain continuing restructuring costs associated with the Aqua Cool sale. *Id.*

On May 15, 2002, Ionics filed its Form 10–Q for the first quarter of 2002, signed by Goldstein and Kuzmak, which confirmed the results in the press release. *Id.* ¶ 54. It stated that EBG's revenues had decreased by 14.9 percent as compared to the first quarter of the previous year ($38,300,000 as compared to $45,000,000), and said that "[t]his decrease was primarily attributable to lower capital equipment revenues, reflecting the winddown of the construction phase of the Trinidad desalination project." *Id.* (quoting Ionics' May 15, 2002 Form 10–Q).

On August 1, 2002, Ionics issued a press release, followed by a Form 10–Q on August 14, 2002 (signed by Goldstein and Kuzmak), stating financial results for the second quarter of 2002, the period ending June 30, 2002. *Id.* ¶¶ 55–56. Revenues were stated as $79,300,000, net income as $2,100,000, and earnings per share as $0.12, as compared to $113,700,000, $4,200,000, and $0.24 per share, respectively, in the second quarter of the previous year. *Id.* ¶ 55. The Form 10–Q made statements about the revenues of EBG and UWG, Ionics' two largest operating segments. *Id.* ¶ 56. It stated that EBG's revenues during the second quarter of 2002 ($38,600,000) had fallen 16.3% from the $46,200,000 figure for the second quarter of 2001, and that the $76,900,000 in revenues since the beginning of 2002 represented a 15.6% decline from the $91,100,000 figure for the first six months of 2001. *Id.* UWG revenues for the second quarter of 2002 ($25,200,000) decreased by $5,600,000, or 18.3%, from the previous year's second quarter, and the $50,200,000 in revenues for the first six months of 2002 constituted a decrease of $21,400,000, or 29.9%, from the figure for the first six months of 2001. *Id.* The fall in UWG revenues was attributed to "continued softness in the microelectronics industry, particularly with respect to domestic capital

equipment sales." *Id.* (quoting Ionics' August 14, 2002 10–Q Form).

Crowell argues that the statements described from May 6, 2002 onward were materially false and misleading, for the reasons discussed above. *Id.* ¶ 57. To the unreported or distorted facts allegedly rendering Ionics' statements materially false and misleading, Crowell adds the following: (1) that Ionics' operating results were materially overstated, given Ionics' failure to reflect project cost overruns related to the EDF project in the company's consolidated financial results, and (2) that Ionics' financial statements for the first two quarters of 2002 were not prepared in accordance with GAAP and were thus materially false and misleading. *Id.*

On November 5, 2002, Ionics "shocked the market" (Crowell's words) by announcing in a press release that it would be restating its financial results for the first two quarters of 2002, "primarily as a result of intercompany transactions between the Company and its French subsidiary that were erroneously recorded at the subsidiary level." *Id.* ¶ 58 (quoting the November 5, 2002 press release). Revenues for the first and second quarters were revised from $80,300,000 and $79,300,000, respectively, to $80,000,000 and $79,700,000, respectively. *Id.* Net income for the first and second quarters was revised from $1,900,000 and $2,100,000, respectively, to $1,500,000 and $1,200,000, respectively (a total restatement of $1,300,000, as described above). *Id.* Earnings per share for the first and second quarters was revised from $0.11 and $0.12, respectively, to $0.08 and $0.07, respectively. *Id.*

Ionics also reported its financial results for the third quarter of 2002, including a large loss associated with its operations in France. *Id.* As a result of these losses, Ionics announced that it would "downsize, discontinue and consolidate various opera-

tions of its French subsidiary." *Id.* (quoting the November 5, 2002 press release). Goldstein stated that:

> [W]hile Ionics' management was disappointed by the need to adjust Q1 and Q2 2002 results primarily due to the issues relating to its French subsidiary, and the need to take unexpected downsizing and cost reduction actions at that subsidiary, management was encouraged by the record backlog which was achieved during an uncertain and difficult economic period worldwide.

*Id.* (quoting the press release).

Immediately following the issuance of the third quarter results, Goldstein, Kuzmak, and other Ionics officials held a conference call with analysts to review those results. *Id.* ¶ 59. Goldstein stated that "the issues in France that we're talking about were discovered less than two weeks ago." *Id.* (quoting a transcript of the call, published by the *Fair Disclosure Wire* ). Later, he said that "[w]hat we discovered ourselves and what we communicated to our outside auditors—they didn't discover this, we did—were two improper, inaccurate recordings of what essentially was a single inter-company [transaction] which was done by the Controller at our French subsidiary." *Id.* (quoting the transcript). In addition he stated that "to a significant degree, the problem we had in France before we recognized the inter-company transactions issue masked the operating problem that we had there and pushed the resolution of staffing and overhead reduction issues ... from the end of Q2, when we should have discovered it, to the end of Q3." *Id.* (quoting the transcript).

Following the November 5, 2002 announcement, shares of Ionics fell $5.01 per share, on volume of over 1,700,000 shares traded, almost thirty times the average daily volume. *Id.* ¶ 61.

### 8. Statements at the End of the Class Period, and Later Developments

On March 14, 2003, at the end of the Class Period, Ionics issued a press release announcing financial results for the fourth quarter of 2002 and for the twelve months ending on December 31, 2002. *Id.* ¶ 62. Ionics reported a $0.11 per share loss for the fourth quarter, excluding final price-adjustment gains on the Aqua Cool sale of $0.21 per share. *Id.* Ionics' operating loss for the fourth quarter reflected an increase of $2,400,000, or $0.06 per share, in Ionics' reserve for doubtful accounts and "higher than normal legal and accounting" costs of $0.04 per share. *Id.* Shortly after the announcement, the price of Ionics common stock fell roughly five percent to close at $16.70 on March 14, 2003, in heavy trading of 1,200,000 shares (similar in order of magnitude to the 1,700,000 shares traded on November 5, 2002). *Id.* ¶ 63.

On March 31, 2003, Ionics filed its annual report on Form 10–K for the fiscal year ended December 31, 2002. *Id.* ¶ 64. Again, this 10–K Report revealed that Ionics' independent auditor had advised it "that certain of its internal controls had deficiencies and material weaknesses." *Id.* (quoting the March 31, 2003 10–K Form). One of the steps Ionics said it was taking was "to evaluate and strengthen its financial and accounting staff and their knowledge and understanding of key policies under U.S. generally accepted accounting principles and of their responsibilities." *Id.* (quoting the 10–K Form). The 10–K Form for the first time described the nature of the transactions that caused Ionics to restate financial results from the first two quarters of fiscal 2002. *Id.* ¶ 65. The transactions had previously been described as "inter-company transactions that were erroneously recorded at the [French] subsidiary level," and it was now revealed that

the transactions related to "project cost overruns." *Id.* (alteration in original). With regard to this, the Form 10–K stated that:

> These adjustments primarily affected accounting entries related to revenues from sales of spare parts and expenses related to project cost overruns, sales support cost and severance costs. These adjustments, which increased the historical pre-tax loss at the French subsidiary in the quarters ended March 31, 2002 and June 30, 2002 and the forecast of the French subsidiary's pre-tax losses for the year ended December 31, 2002.

*Id.* (quoting the 10–K Form).

The 10–K Form also revealed that the final purchase price adjustment settled between Ionics and Nestle reduced the selling price of Aqua Cool by roughly $13,000,000. *Id.* ¶ 66.

The parties agreed at oral argument that the pertinent information from the 10–K Form had been in the March 14, 2003 press release as well, which was issued on the last day of the Class Period.

## II. DISCUSSION

### A. Jurisdiction and Venue

The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and under Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. § 78aa, as the claims in this action arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Rule 10b–5, promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. Crowell has adequately alleged that Ionics made use of the means and instrumentalities of interstate commerce in committing the acts of which he complains. Venue is

proper under 15 U.S.C. § 78aa and under 28 U.S.C. § 1391(b).

## B. Standard of Review

In passing on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded allegations in the non-movant's complaint, except in deciding certain jurisdictional questions not relevant here, and must draw all inferences in favor of the nonmovant. *See, e.g., Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir. 1999). Dismissal "is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." *Id.* As the Court will explain, however, the heightened pleading standard that Federal Rule of Civil Procedure 9(b) applies to fraud allegations, in combination with the strict requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, codified at 15 U.S.C. § 78u–4, make it significantly more difficult for securities fraud plaintiffs to survive a motion to dismiss than for ordinary plaintiffs.

## C. Relevant Legal Standards, Role of Rule 9(b)

To state a claim under Rule 10b–5, "a plaintiff must allege that: (1) in connection with the purchase or sale of securities, (2) the defendant made a false statement or omitted a material fact, (3) with the requisite scienter, and that (4) plaintiff relied on the statement or omission, (5) with resultant injury." *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 52 (D.Mass.1998) (Lasker, J.) (citing *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996), and *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1216–17 (1st Cir.1996)). A misrepresentation or omission is material only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). As for scienter, the plaintiff must plead "a mental state embracing [an] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting the fraud ... shall be stated with particularity." The First Circuit is "especially strict in demanding adherence to Rule 9(b) in the securities context." *Gross,* 93 F.3d at 991.[6] Thus, "the complaint must set forth specific facts that make it reasonable to believe that the defendant knew a statement was materially false or misleading. The rule requires that the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged." *Id.* As this Court has put it: "To survive a motion to dismiss, a complaint alleging fraud must specify: (1) the statements that the plaintiff contends were fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; (4) why the statements were fraudulent." *Fitzer v. Sec. Dynamics Tech., Inc.,* 119 F.Supp.2d 12, 18 (D.Mass.2000).

Allegations based on information and belief "must set forth the source of the information and the reasons for the belief." *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). The allegations must create a "strong" inference of fraudulent intent. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196–97 (1st Cir. 1999) (holding that the PSLRA requires a "strong" inference, rather than merely a

---

**6.** *Gross* has been partially superceded on other grounds by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which is co-dified at 15 U.S.C. § 78u–4. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 191 (1st Cir. 1999).

"reasonable" one). "[E]xaggerated, vague, or loosely optimistic statements about a company are not actionable under Rule 10b–5." *In re Boston Tech.*, 8 F.Supp.2d at 54 (citing *Gross*, 93 F.3d at 995).

Scienter can be proved by showing either knowledge that statements in issue were materially false or misleading, or recklessness in that regard, and the complaint must so plead. *See Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir.2001); *Greebel*, 194 F.3d at 198–201. Mere negligence does not meet the "recklessness" standard. *Geffon*, 249 F.3d at 35–36. Rather, what is required is "a highly unreasonable omission [or statement], involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). In making the scienter determination, courts consider the totality of the circumstances, rather than examining each alleged omission or misstatement in isolation. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir.2002); *Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42, 50–52 (D.Mass.1997) (Harrington, J.)(superseded by statute on other grounds).

Should Crowell successfully make out a primary violation of Rule 10b–5, the parties do not dispute that he can make out control person liability against Goldstein and Kuzmak under Section 20(a) of the Exchange Act. *See, e.g., Gelfer v. Pegasystems, Inc.*, 96 F.Supp.2d 10, 18 (D.Mass. 2000) (Tauro, J.).

### D. The Merits of the Ionics Defendants' Arguments

#### 1. Crowell Does Not Lack Standing

█ The Ionics Defendants note that the only transaction that Crowell made with regard to Ionics common stock during the class period was a purchase on May 7, 2002. Defs.' Mem. at 19 [Doc. No. 14]. They argue that he therefore lacks standing to challenge any alleged misstatements made after that date, because any later statements "could not possibly have inflated" his purchase price. *Id.* (quoting *Gross*, 93 F.3d at 993) (internal quotation marks omitted); *see also Shaw*, 82 F.3d at 1222; *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir.1992).

It is true that one "cannot maintain an action on behalf of class members to redress an injury for which [one] has no standing in [one's] own right". *Gross*, 93 F.3d at 993 (citing *Roots*, 965 F.2d at 1420 n. 6, and *Britt v. McKenney*, 529 F.2d 44, 45 (1st Cir.1976), *cert. denied*, 429 U.S. 854, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976)). *Gross*, however, involved a plaintiff who purchased his stock before *any* allegedly false or misleading statements were made, and is therefore distinguishable. *See* 93 F.3d at 993. "Numerous courts have stated that class representatives do have standing to assert claims under § 10(b) which arise from statements made after the class representative purchased shares as long as the statements allegedly were made in furtherance of a common scheme to defraud." *Upton v. McKerrow*, 887 F.Supp. 1573, 1577 (N.D.Ga.1995) (collecting cases); *cf. Priest v. Zayre Corp.*, 118 F.R.D. 552, 557 (D.Mass.1988) (Zobel, J.) (holding that differing purchase dates does not bar class certification, if all purchases occurred during the course of a common, fraudulent scheme); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 311–12 (D.Mass.1987) (Wolf, J.) (same). Otherwise, "only someone who bought on the last day of the Class Period would be able to bring an action based on allegations such as those in the complaint, either on

her own behalf or on behalf of the entire class." *Nicholas v. Poughkeepsie Sav. Bank/FSB*, 1990 WL 145154, *6, 1990 U.S. Dist. LEXIS 12677, at *15 (S.D.N.Y. Sept. 17, 1990) (citing cases). Here, Crowell alleges a common scheme to defraud, which involved numerous alleged wrongful actions and statements that took place before his purchase.

This Court has previously suggested that it might not join with the courts that grant a lead plaintiff standing to represent claimants injured by statements that took place after his purchase, when those misstatements are part of a common, fraudulent scheme that began before the plaintiff's transactions occurred. *See Abato v. Marcam Corp.*, 162 F.R.D. 8, 10–11 (D.Mass.1995). The Court correctly stated that cases dealing with whether plaintiffs like Crowell meet, say, the typicality requirement for class certification, are not necessarily on point for standing determinations. The Court is, however, persuaded that cases like *Upton*, which apply a "common course of conduct" analysis to standing questions, are better reasoned than cases that require the lead plaintiff to have purchased on the last day of the class period.

In many ways, a "common course of conduct" test is more appropriate in the standing inquiry than in the certification inquiry. The certification inquiry and the standing inquiry have some overlap, insofar as they seek to ensure that issues will be presented effectively to the court, and in that zone, the argument for a "common course" approach is equally strong for each inquiry. The certification inquiry adds to this common ground an element of concern for the rights of *all* class members who may be bound by a class action judgment (although this is perhaps present to a lesser degree in the standing inquiry), and this element weighs against using "common course" analysis, although not enough to prevent courts from adopting it. Standing, on the other hand, adds a concern about separation of powers, an idea that courts should not reach out and decide cases not properly before them. *See* 1 Laurence H. Tribe, *American Constitutional Law* § 3–14, at 387–91 (3d ed.2000) (summarizing and critiquing Supreme Court case law that evinces an increasing emphasis on separation of powers concepts in deciding standing questions). That concern is obviated if there is *any one* plaintiff before the court raising the claim in question; once one plaintiff in a case has standing, courts typically do not inquire whether other plaintiffs do. *E.g., Clinton v. City of New York*, 524 U.S. 417, 431 n. 19, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (citing *Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). To obviate the special concerns raised in the certification inquiry, one would have to bring *all* the later purchasers before the court. To obviate the special concerns raised in the standing inquiry, one would only have to bring *one* such purchaser before the court. It therefore seems that, as long as there is some indication that later purchasers in fact exist, as there invariably will be, a "common course" analysis is entirely appropriate in the standing context.

### 2. Crowell Has Adequately Alleged Scienter

As discussed above, the First Circuit applies a strict standard for plaintiffs pleading scienter. Contrary to the Ionics Defendants' claim, however, Crowell has met that standard.

### a. The Absence of Insider Trading Does Not Preclude an Inference of Scienter

The Ionics Defendants correctly point out that Crowell nowhere alleges that Goldstein, Kuzmak, or any other Ionics

official sold any stock during the Class Period. Defs.' Mem. at 4. The absence of insider trading does weaken a case for scienter. *See In re Sunterra Sec. Litig.*, 199 F.Supp.2d 1308, 1326 (M.D.Fla.2002); *In re N. Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 462 (S.D.N.Y.2000); *In re Segue Software Sec., Inc. Litig.*, 106 F.Supp.2d 161, 171 & n. 23 (D.Mass.2000) (Stearns, J.); *Kalnit v. Eichler*, 99 F.Supp.2d 327, 337 (S.D.N.Y.2000).

Further, the Ionics Defendants argue that SEC filings show that Goldstein's holding of Ionics stock actually lost almost $2,200,000 in value during the class period. Defs.' Mem. at 4 (referencing the SEC filings). If true, this would make the case for scienter even more difficult, at least under a "knowledge" theory. *See Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 920 (N.D.Tex.1998) ("[T]he notion that [the defendant] would engage in fraud and then wait for the stock price to plummet before selling his securities without benefiting from the fraud is a 'non-sensical premise.'"); *see also Maldonado v. Dominguez*, 137 F.3d 1, 12 n. 9 (1st Cir.1998); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 1000 (D.Ariz. 1999). The submitted filings do not, however, conclusively establish that Goldstein engaged in no stock trading during the

Class Period.[7] Thus, the best the Ionics Defendants can say at the motion to dismiss stage is that there is no allegation that any of them profited from stock trading during the Class Period.

Even if none of the Ionics Defendants profited from stock trades during the Class Period, that does not establish that they lacked any motive to mislead the investing public, and a recklessness argument by definition would not require a motive in any event. First, the absence of stock trading profit does not establish the absence of a scheme to profit through insider trading. It only establishes the absence of a successful scheme. The Ionics Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability.

Second, the alleged fraudulent scheme could well produce numerous benefits for each of the Ionics Defendants. Each element of the scheme potentially increases Ionics' profits, stock price, or both. Anything that benefits Ionics in turn benefits Goldstein and Kuzmak; presumably their continued employment, and probably to some extent their compensation, is large-

---

7. The Ionics Defendants provide a copy of Goldstein's August 3, 2001 Form 4 filing, which shows that he possessed 282,555 shares of Ionics common stock at that time. Defs.' App. Ex. 3 [Doc. No. 15]. They also provide a Proxy Statement, dated April 9, 2003, which lists Goldstein as having 802,112 shares as of March 21, 2003, which includes 7,557 shares in a 401(k) plan and 512,000 shares that Goldstein had a right to acquire pursuant to exercise of certain stock options. *Id.* Subtracting the 512,000 and the 7,557 from 802,112 produces exactly 282,555 shares. The Ionics Defendants also correctly state that this Court may take judicial notice of the Form 4, without converting their motion to dismiss into a motion for summary

judgment. *See* Defs.' Mem. at 4 n. 1 (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000), and *In re Stone & Webster, Inc. Sec. Litig.*, 253 F.Supp.2d 102, 128 & n. 11 (D.Mass.2003) (Lindsay, J.)); *see also* Fed. R.Evid. 201(b)(2). The Ionics Defendants have not, however, provided any SEC filings to demonstrate that Goldstein had the same holdings as of October 25, 2001, the beginning of the Class Period, much less on March 14, 2003, the end of the Class Period. The SEC filings submitted would obviously be probative at trial—they suggest that Goldstein did not sell any shares during the class period—but they are scarcely conclusive, particularly at the motion to dismiss stage.

ly tied to the company's performance, as measured by profits, stock price, and other indicia. The artificial inflation of Aqua Cool's sales and customer base would benefit Ionics by potentially giving it a higher sales price for the Aqua Cool unit. Similarly, shifting losses to Ionics' France operations benefited Ionics by artificially inflating the profitability of its North American operations, and by decreasing the tax liability of Ionics France, Ionics' subsidiary. Fraudulent accounting would similarly artificially inflate the profitability of Ionics' operations, and failure to maintain adequate internal controls would make it easier to maintain the fraud and would increase profits by cutting costs that ought not be cut. Of course, none of the benefits of these actions could be realized unless the Ionics Defendants repeatedly made material misrepresentations and omissions to the investing public.

Crowell does not appear to allege any profit by the Ionics Defendants from stock trading during the Class Period, but he adequately alleges that they had pecuniary motives for each of the wrongful actions alleged.[8]

### b. Crowell Alleges Sufficient Facts To Support an Inference that the Ionics Defendants Knew the Alleged Misstatements Were Materially False When Made [9]

■ The Ionics Defendants challenge each class of alleged misstatements individually. Crowell successfully parries every thrust, and could survive the motion to dismiss, even if the Court only examined each allegation in isolation from the others. Crowell provides evidence in the form of particularized allegations by knowledgeable former employees, which "add to the inference of scienter." *See, e.g., In re Lernout & Hauspie Sec. Litig.,* 208 F.Supp.2d 74, 87 (D.Mass.2002) (Saris, J.) (citing cases).

Crowell's case becomes even stronger, however, when the allegations are considered together. The way in which the allegedly fraudulent acts fit together and reinforce one another strongly suggests a conscious course of conduct. Fraudulent contract accounting, failure to maintain adequate internal controls, and shifting of Ionics' costs between different entities (or failing to report such costs at all) all combine to inflate Ionics' profits artificially. Such artificial inflation would make the artificial inflation of Aqua Cool's sales and customer base more believable to Nestle. The tax impact of profits from this inflated sale price is then dampened by the shifting of the EDF Project's costs onto Ionics France. This shift in turn further inflates Ionics' appearance of financial strength. None of the allegedly fraudulent acts could be effective without repeated misstatements to the investing public.

### (1) France/Restatement Allegations

The Ionics Defendants correctly note that standing alone, the fact that Ionics

---

**8.** This second theory of motive is sufficient to get the case to discovery, where it is entirely possible that Crowell could learn that at least one of the Ionics Defendants did in fact profit from stock trading. It is by no means unheard of for an executive to file a Form 4 late, or not at all.

**9.** The Ionics Defendants argue that Crowell's complaint is structured and expressed in a misleading manner. There is little to their allegation that Crowell's "modus operandi is to state a broad proposition followed by supposed support ... attributed to an unnamed source ... [and] typically only loosely related (and at times unrelated) to the preceding proposition." Defs.' Mem. at 7. They stand on firmer ground when they accuse Crowell of "block quoting" in a misleading way, but the complaint still adequately alleges what it must to survive this motion to dismiss. *Id.* at 8.

restated its results does not support a strong inference of scienter. *See In re Peritus Software Servs., Inc.*, 52 F.Supp.2d 211, 224 (D.Mass.1999); *accord Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270–71 (2d Cir.1996). "Instead, the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that defendants knowingly or recklessly misled investors." *In re Peritus*, 52 F.Supp.2d at 224. Thus, though by no means conclusive, violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of scienter. *See, e.g., Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002); *Geffon*, 249 F.3d at 36 (noting that "accounting shenanigans" are probative of scienter); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 148 (D.Mass.2001) (Saris, J.) (similar); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 235 (D.Mass.1999) (noting that GAAP violations combined with other circumstances, including company's violation of own revenue recognition policy, may raise a strong inference of scienter); *Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 735–37 (D.Mass. 1995) (Saris, J.) (holding that an auditor's knowledge that a company violated its own internal policies is sufficient to plead scienter).

The Ionics Defendants characterize what happened as a dispute about "where within the Ionics corporate structure amounts *would be recorded*." Defs.' Mem. at 5. According to the Ionics Defendants, Ionics directed its French subsidiary to record certain losses, and there is no evidence that the Ionics Defendants knew of any failure by the French subsidiary to do so. *Id.* at 6.[10] They note that Ionics publishes its financial statements on a consolidated basis, and argue that whichever subsidiary absorbed the losses, those losses would still appear on the financial statement. *See id.* at 5–6. As Crowell explained at oral argument, however, different allocations of losses among entities on a consolidated financial statement do not necessarily produce identical results when using percentage of completion accounting. This is true even assuming that different allocations do not affect tax liability.

In any case, Crowell's complaint adequately alleges that something sinister was going on. It is improper to place losses on a subsidiary's books that clearly belong either to the parent or to another entity; Crowell thus alleges something more than a good-faith dispute. Moreover, Crowell alleges not merely that Ionics reported cost overruns in the wrong place, but that it ultimately did not report them at all. Pl.'s Mem. at 12 [Doc. No. 17]. Even were this not so, Crowell's allegations about the tax consequences of misallocating cost overruns render specious the Ionics Defendants' argument that "it was all consolidated anyway"; because a later reallocation of those overruns would presumably increase Ionics France's tax liability for that earlier year, Ionics' original accounting choices overstated consolidated profits, possibly by a significant amount. As for knowledge, Crowell adequately alleges that Goldstein ordered the accounting manipulations, and as Crowell correctly points out, the Court can infer that Kuzmak, as Ionics' CFO, and Goldstein, as Ionics' CEO, knew or

---

10. The Ionics Defendants deny that there was any dispute between Ionics and its French subsidiary, or that any such dispute was the reason for the misstatement, although they recognize that this is irrelevant to disposition of the Motion to Dismiss. Defs.' Mem. at 6 n.

4. Ionics points to Goldstein's statements in Ionics' 2002 10–K filing to refute Crowell's claims regarding the reasons for the restatement, *id.* at 6 n. 5, but the Ionics Defendants' self-serving statements cannot be credited at the motion to dismiss stage.

should have known of Ionics' practices in this regard, because their positions gave them unfettered access to internal undisclosed adverse information. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1313–14 (C.D.Cal. 1996); *see also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989).

The Ionics Defendants next argue that certain facts are "incompatible with scienter." Defs.' Mem. at 7. The first fact is the "minuscule amounts of revenues and expenses moved from one quarter to another as a result of the restatement." *Id.* In particular, according to the Ionics Defendants, "[t]he revenues affected by the restatement ($160,000) constituted less than 0.01% of [Ionics'] annual revenues for fiscal 2002 (over $335 million)," and "[t]he expenses affected ($1.1 million) constituted only about 0.3% of [Ionics'] 2002 annual expenses (about $338 million)." Defs.' Mem. at 1.

The focus on revenue, an old chestnut that securities fraud defendants frequently try on judges and juries, is entirely specious. What matters most to investors is income, not revenues, and the restatement led to a downward revision of income for the first two quarters of that year from a total of $4,000,000 to a total of $2,700,000.[11] *See* Defs.' App. Ex. 7 (copy of the November 5, 2002 press release). This constitutes a 32.5 percent downward revision, hardly "minuscule."

To bolster their argument that the restatement was a minor event, the Ionics Defendants argue that the stock price declined only "modestly" on the day the restatement was announced, and that it "rebounded immediately and within less than a week was trading at its pre-restatement level." Defs.' Mem. at 1; Defs.' App. Ex. 1. Assuming *arguendo* that the Court can

take judicial notice of the stock price chart that Ionics provides, the $5 drop that the common stock price experienced on that day (from $24.47 to $19.46) represented 20 percent of the stock's value, hardly "modest." *See* Defs.' App. Ex. 1. The Ionics Defendants' graph of Ionics' common stock price between June 2001 and June 2003 shows that the November 5 drop was the most precipitous one-day drop in that entire period. *See id.* Moreover, based on the stock price chart, the stock price did not "rebound immediately," and certainly did not do so "within less than a week." Rather, although the stock price did recover, there was only one day between the restatement announcement and June 12, 2003 (the last date on the stock chart) where the stock price closed at or above its pre-restatement price: December 16, 2002. *Id.* Admittedly, the November 4, 2002 closing price was itself a local peak, perhaps in anticipation of the November 5, 2002 announcement. Still, for the two or three weeks prior to the announcement, the stock price was consistently closing at over $22, and the stock price did not close at that level again after the announcement until November 25, 2002—three weeks later, not "less than a week." *Id.*

The Ionics Defendants also claim that Crowell credits Ionics' statement that Ionics itself had discovered the erroneous intercompany entries made by the French controller, and had itself brought these entries to its outside auditors' attention. Defs.' Mem. at 7. If Crowell accepted such a statement, it might be inconsistent with scienter, but Crowell does no such thing.

### (2) Aqua Cool Allegations

The Ionics Defendants argue that Crowell at most alleges that Ionics' manipu-

---

11. More accurately, it is the prospect for future earnings growth that matters, but present

income is obviously relevant in evaluating likely future performance.

lations regarding Aqua Cool only sought to deceive Nestle, not the investing public. Defs.' Mem. at 8. Crowell's response refutes this allegation. Figures based on the alleged artificial inflation of Aqua Cool's sales, which allegedly violated GAAP and Ionics' internal accounting policies, were reported to the investing public, who then purchased Ionics stock at an artificially inflated price. Pl.'s Mem. at 14. While it is possible that artificial inflation of Ionics' stock price was merely an unintended consequence of deceiving Nestle, it is equally plausible that such inflation, which would increase Ionics' market capital and access to capital and maintain an appearance that Goldstein and Kuzmak were performing better than they actually were, was an intended consequence.

The Ionics Defendants further argue that Crowell's sources, a former "customer service and accounts receivable clerk at [the] Baltimore D.C. Aqua Cool division from April 1999 to December 2001 and a former operations manager at the Boston office of Aqua Cool from July 2001 to February 2002," were not in a position to know how Ionics financial management calculated the revenues that it reported from the Aqua Cool sale or from customer sales of bottled water. Defs.' Mem. at 9 (internal quotes omitted). Moreover, neither was still employed by Aqua Cool on March 7, 2002, when Ionics reported bottled water sale revenue for the fourth quarter of 2001. *Id.* Neither is alleged to have communicated with Goldstein or Kuzmak, or any other senior Ionics executive. *Id.*

Again, Crowell successfully parries by arguing that these witnesses were employees in different markets, with personal knowledge of Aqua Cool's sales practices, describing the precise means through which a fraud was perpetrated. Pl.'s Mem. at 15 & n. 7. One of the employees received an email indicating that the fraudulent sales practice was company-wide, ordered by an Aqua Cool Vice President. *Id.* at 15. That is sufficient to allege that the scheme was taking place. As to the allegation that the Ionics Defendants knowingly or recklessly failed to reveal this fraudulent scheme in disclosures to the investing public, it can be inferred that top executives at Ionics were aware of a scheme involving systemically fraudulent sales practices, given the importance of the Aqua Cool sale to Ionics' business that year. *See In re Tel–Save Sec. Litig.,* 1999 WL 999427, **6–7, 1999 U.S. Dist. Lexis 16800, at *14 (E.D.Pa. Oct. 19, 1999); *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1326 (E.D.Wash.1998) (citing *Cosmas,* 886 F.2d 8, 10 (2d Cir.1989)) ("[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers.").

Here, moreover, the Ionics Defendants had a clear motive to inflate Ionics' stock price artificially by engaging in a fraudulent scheme to inflate Aqua Cool's sales and customer base artificially. They wanted to maximize Aqua Cool's sale price. Deliberate overstatement of revenues to consummate a major sale or acquisition of stock or assets is sufficient to support a strong inference of scienter. *See In re Livent, Inc. Noteholders Sec. Litig.,* 174 F.Supp.2d 144, 152 (S.D.N.Y.2001); *In re Nanophase Tech. Corp. Sec. Litig.,* 2000 WL 1154631, *6, 2000 U.S. Dist. LEXIS 11744, at *18–19 (N.D.Ill. Aug. 14, 2000); *In re Nuko Info. Sys. Sec. Litig.,* 199 F.R.D. 338, 344–45 (N.D.Cal.2000).

**(3) Internal Controls Allegations**

If the allegations regarding Ionics' failure to maintain adequate internal controls were the only ones in the Complaint, the Court would almost certainly have to dismiss the case. Internal controls allegations are frequently dismissed, even when

a corporation's executives knew that internal controls were inadequate.[12] Such allegations are probative of scienter, however, and can add to the strength of a case based on other allegations. *See, e.g., Svezzese v. Duratek, Inc.,* No. 01–CV–1830, 2002 WL 1012967, at *6 (D.Md. Apr.30, 2002), *aff'd,* 2003 WL 21357313(4th Cir. June 12, 2003).

Facts alleged in Crowell's complaint suggest that Ionics' failure to develop internal controls was egregious. Almost complete reliance for contract revenue figures was placed on estimates made by operations personnel whose compensation was tied directly to contract revenues. A better formula for systematic revenue misstatement would be difficult to imagine. Although it is likely true that standing alone, even this level of mismanagement does not constitute scienter, when considered in context with the other, stronger allegations, it at least strengthens Crowell's case. In particular, Crowell has adequately alleged that Ionics was knowingly (or perhaps recklessly) engaged in multiple courses of conduct to inflate revenues artificially, and the desire to hide such fraudulent conduct would provide an obvious motive to maintain minimal internal controls. This suggests that the failure to maintain internal controls was intentional, rather than negligent. Likewise, the fact that Ionics chose not to implement adequate internal controls reinforces the inference that it was intentionally engaged in the fraudulent courses of conduct described above.

### (4) Contract Accounting Allegations

The Ionics Defendants first refute the contract accounting charges by arguing that all of the alleged conduct supporting them occurred prior to the beginning of the Class Period, and there is no evidence that such practices occurred during the Class Period. Defs.' Mem. at 11. Second, the Ionics Defendants argue that there is no evidence that any of them knowingly accounted for contract revenue improperly. *Id.*

Crowell does not refute these arguments in his brief, which was over-length in any case. His complaint does adequately allege conduct of this sort during the quarter right before the class period began, however, and that quarter ended only 25 days before the commencement of the Class Period. This latter example is at least modestly probative of the approach Ionics was taking to its accounting practices, although it obviously could not make out a securities fraud case standing alone. In other words, the fact that some evidence has been found, pre-discovery, that over a span of several years Ionics at least sometimes, perhaps frequently, engaged in improper contract accounting bolsters Crowell's other, more substantial allegations.

### 3. Crowell Has Adequately Alleged Falsity and Materiality

■ The Ionics Defendants generally argue that Crowell fails to allege specific

---

**12.** *See Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 433 (5th Cir.2002) (holding that accounting failures due to "negligence, oversight, or simple mismanagement" were not actionable); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 711–12 (3d Cir.1996); *Svezzese v. Duratek, Inc.,* No. 01–CV–1830, 2002 WL 1012967, at *6 (D.Md. Apr.30, 2002), *aff'd,* 2003 WL 21357313 (4th Cir. June 12, 2003); *In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1326 (M.D.Fla.2002) (holding that un-

der the circumstances, failure to maintain adequate controls at most constituted negligence, not actionable scienter); *see also Shaw,* 82 F.3d at 1206 (1st Cir.) (noting that mere mismanagement is not actionable under the securities laws); *Glickman v. Alexander & Alexander Servs., Inc.,* 1996 WL 88570, at *15 (S.D.N.Y. Feb.29, 1996) ("Intentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls").

facts that explain why any particular one of the disclosures made was materially false when made. Defs.' Mem. at 13. This simply is not true.

### a. Aqua Cool Allegations

With regard specifically to these allegations, the Ionics Defendants first argue that they are not pled with sufficient particularity. Defs.' Mem. at 13. Relying heavily on this Court's decision in *Fitzer*, they argue that Crowell must allege who the customers that received excess water bottles were, as well as the time, terms, and amount of the specific transactions. *Id.* (citing *Fitzer*, 119 F.Supp.2d at 35–36).

Crowell in turn relies on *Cabletron*, which makes clear that the question whether a complaint satisfies the PSLRA is fact-specific, and that not every question regarding relevant transactions must be answered at the pleading stage. *See* 311 F.3d at 32. More to the point, "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *Id.* at 33.

The complaint in this case is closer to the one in *Cabletron* than to the one in *Fitzer*. Crowell has alleged a specific type of scheme, taking place over a specified time period, for a specified reason, with specified results, based on testimony of multiple witnesses with personal knowledge, and on reasonable inferences from the later downward adjustment in Aqua Cool's sales price. Crowell has, without the benefit of any discovery, made a reasonable estimate of the magnitude of the artificial inflation of Aqua Cool's revenues, based on the fact that Aqua Cool's price was ultimately revised downward by $13,000,000, presumably based primarily on Nestle's "audit" regarding the number and nature of Aqua Cool's active customers. Requiring more of Crowell would be requiring him to "plead evidence."

Despite the Ionics Defendants' protestations to the contrary, Crowell has adequately alleged that statements Ionics made about its financial condition after the fraudulent Aqua Cool scheme began were false. He has demonstrated that before the Aqua Cool sale, a scheme existed whose likely result would be to inflate Ionics' revenues artificially, and that after the statements were made, Nestle's examination of the facts led it to devalue Aqua Cool by $13,000,000. This likely occurred primarily because Nestle found that Aqua Cool had lower sales and a smaller customer base than appeared at the time of the sale. It is difficult to see how Crowell could allege more without "pleading evidence."

The Ionics Defendants next make a specious argument that Ionics' statements regarding Aqua Cool were neither false nor material, because Ionics originally had set aside large cash reserves at the time of the Aqua Cool sale, was able to release some of those reserves after the final adjustment, and was therefore able to realize an additional pre-tax gain of $8,200,000. Defs.' Mem. at 15. The relevant question is not whether there was ultimately a release of reserves, but rather whether Ionics' failure to disclose its artificial inflation of Aqua Cool's sales and customer base would have led a reasonable investor to overestimate the likely amount of that release.

 There can thus be little doubt that the omission was material. Assuming, as it is reasonable to do at this stage, that most of the $13,000,000 readjustment was due to the artificial inflation of Aqua Cool's sales and customer base, Aqua Cool's omission would have led a reasonable investor to overestimate the release by roughly $13,000,000. Ionics' originally reported income for 2001 was $33,300,000,

and this Court can safely say that a 39 percent discrepancy is material, or more accurately, that the question ought go to a jury. *See Cabletron*, 311 F.3d at 34. The 12 percent rise in Ionics' common stock value at the time of the Aqua Cool sale announcement strengthens this conclusion, as Crowell adequately alleges that there was an efficient market for Ionics common stock, and the Ionics Defendants do not dispute that contention. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 (2d Cir.2000); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.2000).

**b. Contract Accounting Allegations**

The Ionics Defendants' arguments in this regard are similar to those in the scienter discussion above, and again, Crowell has not responded to them directly. These allegations thus only currently have significance insofar as they lend plausibility to the Aqua Cool and France/Restatement allegations.

**4. Crowell Adequately Alleges Loss Causation**

A securities plaintiff must plead and ultimately prove two kinds of causation: transaction causation (what induced the purchase) and loss causation (what caused the stock to decline in value and produce a loss). *E.g., In re Polaroid Corp. Sec. Litig.*, 134 F.Supp.2d 176, 188 (D.Mass.2001) (Saris, J.) (citing *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir.2000)). Loss causation thus resembles the concept of proximate cause in tort law. *Id.* The pleading burden for this element is only a "minimal burden," much less than the "strong inference" requirement for scienter, and can be satisfied by alleging that the Ionics Defendants' misstatements artificially inflated the price of Ionics common stock during the class period.[13]

There can be little doubt that Crowell meets this minimal standard. Even under heightened pleading standards, Crowell has alleged that heavy trading and serious devaluation of Ionics common stock occurred in the wake of the November 5, 2002 announcement of restatement (allegedly based on the misallocation of losses at Ionics' French subsidiary), and of the March 14, 2003 announcement.[14] Similarly, Crowell would meet the requirement even if he could only allege that the Ionics Defendants' misrepresentations had induced him to acquire Ionics common stock and that they had "induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 97–98 (2d Cir.2001).

**5. Crowell's "Contingent Liabilities" and "Significant Uncertainties" Meet Pleading Requirements**

The Ionics Defendants argue that two more allegations fail to meet pleading standards. The first is an allegation that GAAP required Ionics to disclose its ongoing payment disputes with Desalcott in financial statements released during the Class Period. *See* Defs.' Mem. at 17; Am. Compl. ¶ 100. Ionics recorded millions of

---

13. *See, e.g., Picard Chem. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1126 (W.D.Mich.1996); *In re Allaire*, 224 F.Supp.2d at 339; *see also In re Xcelera.com Sec. Litig.*, No. 00–CV–11649–RWZ, 2002 WL 745835, *2, 2002 U.S. DIST. LEXIS 7400, at *14 (D.Mass. Mar. 8, 2002) (Zobel, J.) (holding that the pleading requirement was met

where the complaint "continuously allege[d] that this misrepresentation was the proximate cause of [the shareholders'] losing investment").

14. The parties agreed at oral argument that the Aqua Cool price revision was revealed at this time.

dollars in receivables with Desalcott. Am. Compl. ¶ 100. Ionics revealed in its June 30, 2003 10–Q Form that it had "resolved the outstanding payment matters that were in dispute with Desalcott relating to the construction of the [desalination plant] facility." *Id.* (alteration in original). During an investor conference call on August 1, 2003, Douglas Brown, Ionics President and CEO, stated that the resolution of the dispute hurt Ionics' earnings during the second quarter of 2003 (the last quarter of the Class Period). *Id.*

The Ionics Defendants are certainly correct that standing alone, this allegation could not make out a securities fraud case, and the allegation currently has limited probative value. Given that Crowell has now survived the motion to dismiss stage, however, there is no reason to forbid him from exploring this issue further in discovery.

█ Crowell's second allegation stands on firmer ground. Based on the testimony of a former Ionics Vice President of European Operations, Crowell alleges that Ionics formed five to ten special purpose entities ("SPEs") to disguise payments made to Libya, where Ionics had transacted business for years, and that during the fourth quarter of 2001, Ionics wrote off about $1,000,000 in bad debt that it had accumulated over time for bribes and unpaid equipment delivered to Libya. *Id.* ¶ 101. Similarly, the former Vice President alleged that Ionics' office in Italy was "hiding payments under the table to Iraq." *Id.* Crowell urges that failing to disclose these contingent liabilities and significant risks violated GAAP.

These allegations, standing alone, would probably not sustain a securities fraud complaint. They are more specific than the accounts receivable dispute allegation, however, and the Court gives some consideration to the difficulty of pleading matters like this with greater particularity without the benefit of discovery. SPEs are typically "off the books," and there is no indication that the alleged SPEs are under any obligation to file information publicly. Indeed, the purpose of SPEs often is to evade public scrutiny of certain transactions, and to provide participants in those transactions with protections that the law would not afford them were the transactions done in the traditional manner. The secrecy that typically surrounds SPEs and the dubious legality of many of them suggest that Crowell should be permitted to pursue this line of inquiry in discovery. It is hard to imagine how he could plead with more particularity here without "pleading evidence."

## III. CONCLUSION

For the reasons stated above, the Ionics Defendants' Motion To Dismiss [Docket No. 13] was DENIED, although the Court emphasized to Crowell that it would scrutinize discovery requests with some care to ensure that discovery did not become a fishing expedition.